THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL NAFTZINGER                             :
                                            :
                 Plaintiff,                 :
         v.                                 :      3:21-CV-416
                                            :      (JUDGE MARIANI)
STATE FARM INSURANCE COMPANY                :
                                            :
                 Defendant.                 :

## MEMORANDUM OPINION

### I. INTRODUCTION

Before the Court is Defendant's Motion for Partial Summary Judgment (Doc. 10).

Defendant State Farm Insurance Company ("Defendant") seeks partial summary judgment

on Plaintiff's claim for Bad Faith with respect to an insurance claim. (Compl., Doc 1-1, ¶¶

25-27.) For the reasons that follow, the Court will grant Defendant's Motion.

### II. STATEMENT OF UNDISPUTED MATERIAL FACTS

This action arises out of a dispute over an insurance claim by Plaintiff. Defendant

has submitted a "Concise Statement of Material Facts" ("SOF") (Doc. 10-3) as to which it

submits that there is no genuine issue or dispute. Plaintiff failed to file a response to

Defendant's statement.

Pursuant to Middle District of Pennsylvania Local Rule 56.1:

A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be
accompanied by a separate, short and concise statement of the material facts,

in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

M.D. Pa. Local Rule 56.1. This Rule "was promulgated to bring greater efficiency to the work of the judges of the Middle District" and is "essential to the Court's resolution of a summary judgment motion due to its role in organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *Weitzner v. Sanofi Pasteur, Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (internal quotation marks omitted). A District Court "is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance", including striking non-responsive statements of material fact by the non-moving party or deeming a moving party's statements of material fact to be admitted where the non-moving party fails to respond. *Id. See also*, *Rau v. Allstate Fire and Casualty Ins. Co.*, 793 F.App'x 84 (3d Cir. 2019) ("Because a failure to object to a statement of facts is an admission under Local Rule 56.1, and the District Court has authority to impose sanctions for noncompliance with the local rules, we find no abuse of discretion in

the decision to deem certain paragraphs of [Defendant's] SUF admitted."); *Ryan v. Berwick Industries, Inc.*, 30 F.Supp.2d 834, 837 (M.D.Pa. 1998) (deeming Defendant's statement of material facts to be undisputed where Plaintiff failed to file a statement of material facts responding to that of Defendant). However, even when deeming as undisputed the moving party's statement of material facts, a court is still required to conduct a "full analysis to determine whether granting summary judgment [is] appropriate." *Weitzner*, 909 F.3d at 614 (citing *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990)).

Defendant's statement of facts will be deemed unopposed. Plaintiff has inexplicably failed to file the required response to Defendant's statement of facts, and instead has chosen to file a response to Defendant's Motion for Partial Summary Judgement. (Doc. 11.) This is not compliant with Local Rule 56.1. Moreover, even if the Court were to construe Plaintiff's filing as somehow a response to Defendant's Statement of Facts, it is entirely inadequate. Plaintiff responds to facts in Defendant's Motion with general denials, conclusory allegations, or denials with boilerplate language without citations to the record. The non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, for these reasons, the Court will deem admitted Defendant's SOF in accordance with Local Rule 56.1.

This case arises from a property damage claim at property located at 5 Oak Street, Port Clinton, PA 19549 ("Property"). (SOF ¶ 1.) Plaintiff owns the Property and has owned it

since 2008 after inheriting it from his family. (SOF ¶ 2.) At all times relevant to this litigation,

Plaintiff has a homeowners insurance policy with Defendant, which was issued upon

transfer of the Property to his name. (SOF ¶ 3.) Specifically, Defendant issued insurance

policy number 78-64-6061-8 ("Policy"), consisting of:

- Homeowners Policy form HW-2138 (with Options OL and ID);

- Cyber Event, Identity Restoration, and Fraud Loss Coverage form HO-2609; and

- Back-Up of Sewer or Drain Endorsement form HO-2444, which insured the Property.

(SOF ¶ 4.)

The Policy contains the following provision:

**SECTION I – LOSSES INSURED**

**COVERAGE A – DWELLING**

*We* will pay for accidental direct physical loss to the property described in
Coverage A, unless the loss is excluded or limited in **SECTION I – LOSSES
NOT INSURED** or otherwise excluded or limited in this policy. However, loss
does not include and we will not pay for, any diminution in value.

(Def's Ex. B, Doc. 10-5, at 21; SOF ¶ 5.)

Additionally, the Policy contains the following exclusions:

**SECTION I – LOSSES NOT INSURED**

1. *We* will not pay for any loss to the property described in Coverage A that
consists of, or is directly and immediately caused by, one or more of the perils
listed in items a. through m. below, regardless of whether the loss occurs
abruptly or gradually, involves isolated or widespread damage, arises from
natural or external forces, or occurs as a result of any combination of these:

. . . .

4

g. wear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown;

. . . .

3. We will not pay for, under any part of this policy, any loss consisting of one or more of the items below. Further, we will not pay for any loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to, or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

. . . .

b. defect, weakness, inadequacy, fault, or unsoundness in:

(1) planning, zoning, development, surveying, or siting;

(2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, or compaction;

(3) materials used in repair, construction, renovation, remodeling, grading, or compaction; or

(4) maintenance; of any property (including land, structures, or improvements of any kind) whether on or off the residence premises.

(Def's Ex. B, Doc. 10-5, at 23-24, 27; SOF ¶ 6.)

On April 30, 2020, the Property suffered damage as a result of a wind storm (the "Loss"). (SOF ¶ 7.) After noticing the damage to his roof, Plaintiff reported the Loss to his insurance agent, Kay Greenawalt. (SOF ¶ 8.) Ms. Greenawalt provided Plaintiff with a list of independent contractors for Plaintiff to contact in order to repair the damage caused by the Loss. (SOF ¶ 9.) Plaintiff contacted Larry Miller General Contracting to provide an estimate

for repairs to the Property and fasten down the roof of the Property. (SOF ¶ 10.) Plaintiff understood that because Larry Miller was a general contractor, if hired, he could repair damage caused by the Loss. (SOF ¶ 11.) After inspecting the entire Property, Larry Miller General Contracting provided estimates for the repairs as follows:

- Roof Replacement: $13,918.16

- Roof Repair: $4,628.47

- Removal and Replacement of Interior Paneling, Plaster, and Insulation: $19,302.09

- Replacement of Siding: $11,200.00

(Def's Ex. E, Doc. 10-8; SOF ¶ 12.)

The total cost of repairs to the Property as estimated by Larry Miller General Contracting is $49,048.72. (SOF ¶ 13.) Plaintiff was aware that the total estimate given by Larry Miller General Contracting for replacement and repair of the roof was less than $19,000.00. (SOF ¶ 14.)

On May 7, 2020, Defendant conducted a virtual inspection of the interior of the Property. (SOF ¶ 15.) The virtual inspection of the Property was performed by Mr. Payton A. Jansen. (SOF ¶ 16.) Mr. Jansen was assigned to work virtually for this storm event due to protocols related to Covid-19. (SOF ¶ 17.) The virtual inspection required Plaintiff to show Mr. Jansen the areas of the Property that were damaged. (SOF ¶ 18.) Mr. Jansen did not make any assumptions regarding damage to the interior of the Property; rather, he relied

upon Plaintiff walking around with his phone and showing Mr. Jansen the damage. (SOF ¶ 19.) Plaintiff testified that some time after showing Mr. Jansen the damaged areas of the interior, things "started showing up that weren't there before." (SOF ¶ 20.)

On May 15, 2020, Defendant's first in-person inspection of the exterior of the Property was performed by a man who is only named in the parties' filings as "Jose." (SOF ¶ 21.) During the exterior inspection, Jose took measurements and looked at the roof of the Property and inspected the roof of the shed, despite Plaintiff's testimony that Jose could see from the ground that there was no damage to the shed. (SOF ¶ 22.)

Mr. Jansen based the exterior portion of his estimate of damages on the photographs and notes generated during Jose's exterior inspection. (SOF ¶ 23.) After Mr. Jansen prepared the initial draft of Defendant's estimate of damages, his Team Manager reviewed the estimate and added additional considerations for roofing materials, fascia repairs, and high repairs. (SOF ¶ 24.) Mr. Jansen's final estimate of the damage to the Property contained a total Replacement Cost Value of $22,408.16, and after accounting for depreciation and the Policy's $1,000.00 deductible, resulted in a Net Actual Cash Value Payment of $15,146.67. (SOF ¶ 25.) The Replacement Cost Values in the Defendant's estimate as of May 16, 2020, can be broken down as follows:

- Total Roof Replacement and Fascia Repairs: $18,142.84

- Total Interior Repairs: $3,592.72

- Debris Removal: $672.60

(*See* Def's Ex. G, Doc. 10-10; SOF ¶ 26.)

Based on the estimate prepared by Mr. Jansen and the first two inspections of the Property, Defendant issued a payment to Plaintiff in the amount of $15,146.67. (SOF ¶ 27.) In a letter dated May 16, 2020, and sent to Plaintiff, Mr. Jansen also stated the following:

> Based upon the results of our discussions, site inspection, and investigation, damage was confirmed to the upper roof slopes, fascia, and interior caused by windstorm. . . . As we further discussed, no accidental direct physical loss was evident to the remaining roof surfaces or exterior of the home, related to the storm on the reported date of loss. Damage was found caused by wear, tear and deterioration related to the age of the roof coverings. Your Homeowners Policy does not cover damage resulting from these causes of loss.

(See Def's Ex. I, Doc. 10-12; SOF ¶ 28.)

Approximately two weeks after Defendant issued the payment to Plaintiff for $15,146.67, Plaintiff hired State Public Adjusting Company ("SPAC") as his public adjuster in connection with the Loss. (SOF ¶ 29.) On or about June 6, 2020, SPAC sent to Defendant an estimate of damages to the Property totaling $154,125.00. (SOF ¶ 30.) The Replacement Cost Values on the SPAC estimate can be broken down as follows:

- Roof Replacement: $63,438.20

- Elevations (Siding, Insulation, House Wrap): $30,558.23

- Total Interior Repairs: $51,913.92

- Dumpster and Scaffolding: $4,443.12

- Water Mitigation: $3,771.53

(*See* Def's Ex. J, Doc. 10-13; SOF ¶ 31.)

Upon review of the SPAC estimate and related photographs, Dale Schaefer, the State Farm Claim Owner for Plaintiff's subject insurance claim as of June 6, 2020, requested a possible additional inspection of the Property. (SOF ¶ 32.) The request for an additional inspection was made in order to investigate the differences between the SPAC estimate and Defendant's estimate. (SOF ¶ 33.)

Plaintiff was present at the time of Defendant's second in- person inspection, which occurred on June 18, 2020. (SOF ¶ 34.) Defendant also conducted a third in-person inspection on August 5, 2020, which was performed by Michael Pleasant. (SOF ¶ 35.) Plaintiff remembers there being three in-person inspections of the Property by Defendant. (SOF ¶ 36.)

After Defendant's third in-person inspection was performed, Defendant's estimate was revised upward to account for additional sanding and refinishing of interior flooring and additional square footage for acoustic tiles in the stairway, resulting in a new Replacement Cost Value of $24,809.73. (SOF ¶ 37.) The Replacement Cost Values in the Defendant estimate as of August 5, 2020, can be broken down as follows:

- Total Roof Replacement and Fascia Repairs: $18,142.84

- Total Interior Repairs: $5,994.29

- Debris Removal: $672.60

(*See* Def's Ex. L; Doc. 10-15; SOF ¶ 38.)

Accordingly, on August 5, 2020, a supplemental payment was issued to Plaintiff and SPAC in the amount of $3,341.24. (SOF ¶ 39.) Plaintiff testified that the large discrepancy between the SPAC estimate and the estimate created by Larry Miller General Contracting was because there was a "much more expensive" roof on the Property than Plaintiff or Mr. Miller previously realized. (SOF ¶ 40.) Plaintiff confirmed that he is not aware of any contractor work or moisture readings that were taken to indicate that there was water damage behind his interior paneling or exterior siding. (SOF ¶ 41.)

On September 28, 2020, Defendant sent a payment to Plaintiff in the amount of $2,858.18 for damage to personal items in the Property. (SOF ¶ 42.) SPAC requested that Defendant go to appraisal under the terms of the Policy, but after Plaintiff's counsel became involved, Plaintiff withdrew from appraisal. (SOF ¶ 43.)  Plaintiff has not spent any of the insurance money sent to him by Defendant, nor have any remediation or repairs, other than the initial emergency repairs, been done to the Property since the Loss. (SOF ¶ 44.)

On November 11, 2021, defense expert Doug Weiss inspected the Property, after which he authored an expert report dated December 29, 2021. (SOF ¶ 45.) In his expert report, Mr. Weiss notes several areas of the roof at the Property where previous repairs were performed, including the following:

> The repairs to the standing seam metal roofing indicate that his roof had areas where water had been getting through the roofing and leaking into the interior. I walked through the third floor. I observed areas where it appears water has been leaking into areas for an extended period of time. The third floor has paneling on the walls and ceiling. I found no indication that the rafters were lifted by the winds on the date of loss.

(*See* Def's Ex. M, Doc. 10-16, at 1; SOF ¶ 46.)

Mr. Weiss also concluded as follows:

> I found no damage to the existing gutters. I found no damage to the vinyl siding or the rigid insulation behind the vinyl siding. I unfastened vinyl siding to inspect the rigid insulation. I refastened the existing siding into the original position. The staining evident on various areas of siding is long-term in nature and did not result from this loss. This is especially evident because siding stains can be seen on exterior sides of the structure which are not implicated in this loss. Thus, there is no loss-related need to wrap the house or to replace the vinyl siding and related insulation.

(*See* Def's Ex. M, Doc. 10-16, at 2; SOF ¶ 47.)

Upon reviewing the SPAC estimate, Mr. Weiss concluded, *inter alia*, as follows:

> [On the SPAC estimate,] 20 ounce copper was used as the replacement for the painted metal roofing. The proper replacement materials would be prefinished steel standing seam metal roofing.
>
> . . . .
>
> The public adjuster thinks all the sheathing needs to be replaced. I found no indications that these additional costs are needed to replace the damages to the standing metal roofing which was bent by wind. . . The public adjuster believes the siding, rigid insulation, and house wrap need to be replaced. . . I found no wind or water damage to the wood strips, the insulation, or the vinyl siding.
>
> . . . .
>
> On their estimate [SPAC lists] to replace the plaster, paneling and rigid insulation. That makes two complete finishes that they believe need to be replaced. If the wind did damage these third floor products, only the paneling would need to be attached to the framing. There were several areas on the metal roofing which were previously repaired. These previous repairs indicate that previous issues allowed water to leak into the third floor and create damages to the plaster, paneling, insulation, and flooring. The previous interior damages were not repaired and should not be a part of this claim.

11

(*See* Def's Ex. M, Doc. 10-16 at 2-3; SOF ¶ 47.)

## III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan,* 497 U.S. at 888. Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson,* 477

U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial

is usually necessary.

## IV. ANALYSIS

In its Motion for Partial Summary Judgment (Doc. 10), Defendant seeks summary

judgement on Plaintiff's Bad Faith claim relating to Defendant's roof and mold damage

assessments. Pennsylvania's bad faith statute provides the following:

> In an action arising under an insurance policy, if the court finds that the insurer
> has acted in bad faith toward the insured, the court may take all of the following
> actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made
>     by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. § 8371.

"[T]he bad faith insurance statute is concerned with the duty of good faith and fair

dealing." *Ash v. Cont'l Ins. Co.,* 932 A.2d 877, 883 (Pa. 2007) (internal citations omitted).

Though the statute does not define "bad faith," Pennsylvania's Superior Court has explained

that "bad faith" includes "any frivolous or unfounded refusal to pay proceeds of a policy."

*Berg v. Nationwide Mut. Ins. Co.,* 44 A.3d 1164, 1171 (Pa. Super. Ct. 2012) (internal

citations and quotation marks omitted). To that end, "the insured must show that the insurer

did not have a reasonable basis for denying benefits under the policy and that the insurer

knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *Id.* "[I]t is not necessary that the refusal to pay be fraudulent. However, mere negligence or bad judgment is not bad faith." *Id.* "The insured must also show that the insurer breached a known duty (i.e., the duty of good faith and fair dealing) through a motive of self-interest or ill will." *Id.*

Conversely, "an insurer may defeat a claim of bad faith by showing that it had a reasonable basis for its actions." *Post v. St. Paul Travelers Ins. Co.,* 691 F.3d 500, 522 (3d Cir. 2012) (internal citations and quotation marks omitted). "Even questionable conduct giving the appearance of bad faith is not sufficient to establish it so long as the insurer had a reasonable basis to deny coverage." *Id.* at 523. Bad faith "must be proven by clear and convincing evidence and not merely insinuated." *Id.* (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.,* 649 A.2d 680, 688 (Pa. Super. Ct. 1997)).

> This heightened standard requires evidence so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith. Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial. In a bad faith case, summary judgment in favor of the insurer is appropriate when there is no clear and convincing evidence that its conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim.

*Id.* (internal citations, brackets, and quotation marks omitted).

Faced with such an exacting standard, the Court concludes that partial summary judgment is warranted. In its Motion for Partial Summary Judgment, Defendant provides sufficient evidence of the reasonableness of their estimates with respect to both the roof

15

and mold damages, while Plaintiff lacks clear and convincing evidence that Defendant's conduct was unreasonable and knowing or reckless. *Post,* 691 F.3d at 522.

## A. Roofing Estimates

With respect to Plaintiff's claim of Bad Faith on Defendant's roof repair estimates, Defendant performed four inspections of the Property following the Loss. (*See* SOF ¶¶ 15, 21, 34-36.) The record reveals that the disagreement between the parties with respect to the cost of the roof repair primarily centers around the specific type of roofing on Plaintiff's home and a comparable replacement for it. (*See* Pl.'s Br. Opp., Doc. 11-1 at 2) (Alleging that "[w]ithout any reasonable basis, the claims adjusters' supervisors directed that the estimates be revised to remove the expensive copper equivalent."). Within Defendant's Claim Log, Defendant's inspection performers outline their estimates of what roof material would be of "like kind and quality to the roofing that exists on the home." (*See* Claim Log, Doc. 11-10 at 1) ("Consensus is that the roof material used on original SFE is like kind and quality to the roofing that exists on the home.") Additionally, as Defendant points out, "Defendant State Farm's roofing estimate differs from Mr. Miller's[, Plaintiff's own initial estimator,] by only $403. 79." (*See* Doc. 10-2 at 14; SOF ¶¶ 12, 31, 38.) This evidence shows that Defendant had reasonably concluded that a lower-cost roof than the estimate provided by Plaintiff's Public Adjuster would suffice as a roof of like kind and quality. Therefore, the Court finds that Defendant has sufficiently offered "a reasonable basis for

denying [additional] benefits," *Berg,* 44 A.3d at 1171, with respect to its final roofing estimates.

Although Plaintiff alleges without support in the record a scheme by which Defendant "changed, ignored, and deleted" the previous estimates of its investigators in favor of a lower anticipated cost of repair (Pl.'s Resp. Def's Mot., Doc. 11 ¶¶ 63, 70), Plaintiff does not provide any "clear and convincing evidence that [Defendant's] conduct was unreasonable and that [Defendant] knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Post,* 691 F.3d at 522. Plaintiff references the fact that there were divergent estimates by Defendant as to what comparable kind and quality of roof would be sufficient to replace Plaintiff's current roof (Doc. 11 ¶¶ 63, 65, 70), but such differences in viewpoints within State Farm as to a comparable roof are far from "clear and convincing evidence that its conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Post,* 691 F.3d at 522; *see also J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (affirming summary judgment in insurer's favor on bad faith claim because there was a reasonable basis to deny coverage, even though insurer took inconsistent coverage positions in various situations and made false statements in its marketing materials).

Even if the Court were to assume, *arguendo,* that the evidence of Defendant's initially conflicting roofing estimates was arguably suspicious, which it does not, "[e]ven questionable conduct giving the appearance of bad faith is not sufficient to establish it so

long as the insurer had a reasonable basis to deny coverage." *Post*, 691 F.3d at 523.

Therefore, the Court concludes that summary judgment is warranted on Plaintiff's Bad Faith

claim with respect to Defendant's roofing estimates.

### B. Mold Damage Estimates

Defendant contends that summary judgment is warranted with respect to Plaintiff's Bad

Faith claim relating to mold damage on Plaintiff's house. (Def's Reply Br. Supp. Mot. P.S.J.,

Doc. 12 at 7-10.) Plaintiff alleges that Defendant acted in bad faith as to its decision to not

provide coverage for mold damages to Plaintiff's home:

> At trial the Plaintiff will also provide evidence that the Defendant completely
> ignored, and failed to provide coverage for Plaintiff's interior mold and related
> damages, notwithstanding that it had been provided with a report by a mold
> expert. The Plaintiff has been unable to live at his property which has been a
> family home for decades due to the Defendant's reckless and unreasonable
> response to his claim.

(Pl's Br. Opp., Doc. 11-1 at 3.)

Defendant provides ample reasons for its denial of coverage relating to mold

damages, and Plaintiff does not sufficiently offer facts showing "clear and convincing

evidence that its conduct was unreasonable and that it knew or recklessly disregarded its

lack of a reasonable basis in denying the claim." *Post,* 691 F.3d at 522. Defendant points to

its Policy insuring Plaintiff that contains the following provisions relating to coverage for

fungus:

**DEFINITIONS**

. . . .

18

8. *"fungus"* means any type or form of *fungus*, including mold, mildew, mycotoxins, spores, scents, or by-products produced or released by fungi.

. . . .

## SECTION I – LOSSES NOT INSURED

. . . .

2. *We* will not pay for, under any part of this policy, any loss that would not have occurred in the absence of one or more of the following excluded events. *We* will not pay for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs abruptly or gradually, involves isolated or widespread damage, occurs on or off the *residence premises*, arises from any natural or external forces, or occurs as a result of any combination of these:

. . . .

g. *Fungus*, including:

(1) any loss of use or delay in rebuilding, repairing, or replacing covered property, including any associated cost or expense, due to interferences at the *residence premises* or location of the rebuilding, repair, or replacement, by *fungus*;

(2) any remediation of *fungus*, including the cost to:

> (a) remove the *fungus* from covered property or to repair, restore, or replace that property; or

> (b) tear out and replace any part of the *building structure* or other property as needed to gain access to the *fungus*; or

(3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence, or level of *fungus*, whether performed prior to, during, or after removal, repair, restoration, or replacement of covered property.

(See Def's Ex. B, Doc. 10-5 at 2, 14, 16-17; Doc. 12 at 8-9.)

Additionally, Defendant notes that the relevant Policy imposes an express duty on Plaintiff to protect the property from further damage:

### SECTION I – CONDITIONS

. . . .

2. **Your Duties After Loss.** After a loss to which this insurance may apply, **you** must cooperate with **us** in the investigation of the claim and also see that the following duties are performed:

. . . .

b. protect the property from further damage or loss and also:

> (1) make reasonable and necessary temporary repairs required to protect the property; and

> (2) keep an accurate record of repair expenses.

(Id. at 20; Doc. 12 at 9-10.)

Finally, Defendant points to the expert report of Mr. Weiss indicating that damages relating to water on the interior of the house likely arose from acts or omissions occurring prior to the Loss. (Doc. 10 ¶¶ 31, 73.) As the Court references, supra at 9, Mr. Weiss concluded that much of the damage to the interior of Plaintiff's property was caused by acts or omissions that occurred prior to the Loss. (Def's Ex. M, Doc. 10-16 at 1-3; SOF ¶¶ 46, 48.)

Because Defendant has offered evidence that it had a reasonable basis for denying coverage with respect to damage caused by mold, Defendant has sufficiently offered "a

reasonable basis for denying benefits," *Berg,* 44 A.3d at 1171, with respect to its denial of additional coverage for damage stemming from mold and fungus.

Additionally, Plaintiff offers no "clear and convincing evidence that [Defendant's] conduct was unreasonable," *Post,* 691 F.3d at 522, and merely alleges that "[a]t trial the Plaintiff will also provide evidence that the Defendant completely ignored, and failed to provide coverage for Plaintiff's interior mold and related damages, notwithstanding that it had been provided with a report by a mold expert." (Doc. 11-1 at 3.) Plaintiff does not offer any evidence that there is a genuine dispute of material fact as to whether Defendant acted in bad faith, and thus fails to meet the stringent standard to defeat a summary judgment motion for Bad Faith claims. *See Post,* 691 F.3d at 522-3 ("while bad faith may also extend to the insurer's investigative practices, in the absence of evidence of a dishonest purpose or ill will, it is not bad faith for an insurer to take a stand with a reasonable basis or to aggressively investigate and protect its interests") (summarizing *J.C. Penney*, 393 F.3d at 368) (internal citations and quotation marks omitted).

Therefore, the Court concludes that summary judgment is warranted on Plaintiff's Bad Faith claim with respect to Defendant's mold estimates.

## V. CONCLUSION

For the reasons discussed, Plaintiff's Motion for Partial Summary Judgment (Doc. 10) will be granted. An appropriate Order is filed simultaneously with this Memorandum Opinion. A trial will be scheduled to resolve all remaining issues by separate Order.

Robert D. Mariani
United States District Judge